United States District Court
For the Northern District of California

1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5            FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   ANTONIO PRADO,                     ) Case No. 09-4419 SC
                                       )
8              Plaintiff,              ) MEMORANDUM OF DECISION,
                                       ) FINDINGS OF FACT, AND
9       v.                             ) CONCLUSIONS OF LAW
                                       )
10  ALLIED DOMECQ SPIRITS AND WINE     )
11  GROUP DISABILITY INCOME POLICY,    )
                                       )
12             Defendant.              )
                                       )
13  ─────────────────────────────────  )
                                       )
14  LIBERTY LIFE ASSURANCE COMPANY OF  )
    BOSTON,                            )
15                                     )
               Real Party in Interest. )
16  ─────────────────────────────────  )

17  **I.    INTRODUCTION**

18      Plaintiff Antonio Prado ("Prado" or "Plaintiff") commenced

19  this action against the Allied Domecq Spirits and Wine Group

20  Disability Income Policy ("Allied" or "the Plan"), bringing three

21  causes of action: (1) failure to extend disability benefits in

22  accordance with the Plan and the Employee Retirement Income

23  Security Act of 1974 ("ERISA"), 28 U.S.C. § 1132; (2) violation of

24  section 10111.2 of California's Insurance Code; and (3) failure to

25  produce records under 29 U.S.C. § 1332(c) and 29 C.F.R. § 2560.503-

26  1.  The Real Party in Interest is the Claims Administrator, Liberty

27  Life Assurance Company of Boston ("Liberty" or "Defendant").

28  Plaintiff and Liberty have now moved for judgment pursuant to Rule

52 of the Federal Rules of Civil Procedure.  ECF Nos. 40 ("Pl.'s
Mot."), 49 ("Def.'s Opp'n"), 44 ("Def.'s Mot."), 68 ("Pl.'s
Opp'n"), 73 ("Def.'s Reply").[1]  Trial occurred on June 6, 2011,
during which the Court requested both parties submit proposed
findings of fact and conclusions of law.  ECF No. 77.  The parties
have complied with the Court's request.  ECF Nos. 81 ("Def.'s
FFCL"), 82 ("Pl.'s FFCL").  Having read and considered the parties'
respective submissions, the Court rules as follows.

**II.   FINDINGS OF FACT**

    **A.   Evidence Considered by the Court**

As the Court will discuss infra, abuse-of-discretion review of
an ERISA claim denial is generally limited to the administrative
record; that is, the papers the insurer had when it denied the
claim.  Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income
Prot. Plan, 349 F.3d 1098, 1110 (9th Cir. 2003).  However, if the
denial is made by an administrator operating under a conflict of
interest, the court has discretion to permit discovery beyond the
administrative record into the nature, extent, and effect of this
conflict on the administrator's decision-making process.  Welch v.
Met. Life Ins. Co., 480 F.3d 942, 949-50 (9th Cir. 2007).
Similarly, if an administrator presents a new reason for its denial
in its final administrative decision, the claimant is entitled to
present evidence regarding that denial and to have the district
court consider it.  Saffron v. Wells Fargo & Co. Long Term
Disability Plan, 522 F.3d 863, 872 (9th Cir. 2008).  Evidence

[1] Plaintiff's Motion was erroneously electronically filed as a
trial brief.

*United States District Court*
For the Northern District of California

considered beyond the administrative record "need not satisfy the strict rules for the admissibility of evidence in a civil trial, and may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability."  Tremain v. Bell Indus., Inc., 196 F.3d 970, 978 (9th Cir. 1999).

On August 2, 2010, the Court determined that Liberty operated under a conflict of interest and permitted Plaintiff to conduct limited discovery into the "nature, extent, and effect of Liberty's conflict of interest on its decision-making process."  ECF No. 35 ("Aug. 2, 2010 Order").

With this framework in mind, the Court evaluates the admissibility of evidence submitted by the parties.

### 1.   The Claim File

Liberty submits the Claim File ("CF"), which it alleges is the complete record on which Liberty based its denial of Plaintiff's benefits claim and his subsequent appeal.  Gray Decl. Ex C ("CF").[2] The Claim File consists of 4090 pages of records and one DVD containing surveillance video of Plaintiff from September and October 2009.  Plaintiff does not challenge the authenticity of the Claim File; in fact, it contains numerous documents Plaintiff submitted to Liberty in support of his claim.

### 2.   The Plan Documents

Liberty submits copies of what it alleges are the Policy and the Summary Plan Description; these are the plan documents Liberty provided to Plaintiff during the claims process.  McNerney Decl.

---

[2] Lisa Gray ("Gray"), appeal review consultant for Liberty, filed a declaration in support of Liberty's Motion.  ECF No. 47.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Exs. A ("Policy"), B ("SPD").[3]  Plaintiff alleges that Defendant
has failed to provide the Plan document and disputes whether the
two produced documents accurately reflect the terms of the Plan.
Pl.'s Mot. at 23.  Plaintiff alleges that the Plan which he
participated in is titled "Hiram Walker & Sons Long-Term Disability
Plan Number 507," and that Liberty has produced no such plan.  Id.
Plaintiff states: "Without the Plan, who knows whether there is a
difference between the insurance policy, which Liberty has been
using as if it were the Plan, and the Plan itself."  Pl.'s Mot. at
24.

The SPD is clearly identified as the summary plan description
of "Hiram Walker & Sons Inc. Long Term Disability Plan Number 507."
SPD at 26.[4]  The Policy contains no mention of "Hiram Walker &
Sons" or "Plan Number 507," and identifies Allied Domecq Spirits
and Wine as the Plan's sponsor.  Policy at 2.  Both the Policy and
the SPD bear the same policy number: GF3-841-431862-01.  Policy at
1; SPD at 3.  To authenticate the Policy and SPD, Liberty submits
the declaration of Carolyn McNerney ("McNerney"), who identifies
herself as the current "Assistant Corporate Secretary for Pernod
Ricard USA," an "affiliated company" that she claims currently
administers the Plan.  Id. ¶ 1.  McNerney states: "I can declare
that [the Policy and the SPD] are true and authentic copies of the
Group Disability Income Policy issued to Allied Domecq Spirits and
Wine . . . and the operative Summary Plan Description."  Id. ¶ 2.

---

[3] Carolyn McNerney ("McNerney") filed a declaration in support of
Liberty's Motion.  ECF No. 48.

[4] In this Circuit, the SPD constitutes a plan document that "should
be considered when interpreting an ERISA plan."  Bergt v. Ret. Plan
for Pilots Employed by Mark Air, Inc., 293 F.3d 1139, 1143 (9th
Cir. 2002).

4

McNerney declares that when Allied purchased Hiram Walker-Gooderham & Worts of Canada in 1987, "the Hiram Walker & Sons Long-Term Disability Plan Number 507 became known as the Allied Domecq Spirits & Wine USA Inc. and Subsidiary & Affiliated Companies Group Welfare Insurance Plan for Employees in the US." <u>Id.</u> ¶ 4. McNerney states that "after a diligent and complete search, no other plan documents have been located." <u>Id.</u> ¶ 9.[5]

In light of the above, the Court finds that the Policy and SPD produced during the claim process contain satisfactory indicia of reliability, and accepts the terms provided in the Policy and the Summary as the terms of the Plan.

        3.   <u>Other Evidence Submitted by Liberty</u>

Liberty submits the declaration of Paula McGee ("McGee"), litigation manager of disability claims for Liberty.  ECF No. 45. McGee declares that through her position as litigation manager, she is familiar with Liberty's claims and underwriting operations, as well as Plaintiff's claim.  <u>Id.</u> ¶ 2.

///

///

---

[5] In its August 2, 2010 Order, the Court sustained Plaintiff's objection to a similar declaration by McNerney in which she attempted to authenticate these plan documents, and permitted Plaintiff to conduct discovery of the plan documents.  Aug. 2, 2010 Order at 13.  While Liberty was uncooperative in responding to Plaintiff's discovery requests, as the Court discusses <u>infra</u>, Liberty did produce a document that it identified as "Group Income Disability Policy GF3-841-431862-01" and five amendments to it. Cogan Decl. Ex. D. ("Exhibit D").  Both the Policy produced during the claims process and Exhibit D bear the same policy number ("GF3-841-431862-01").  The first pages of both documents differ (Exhibit D is signed by the "secretary" and "president," while the Policy is not).  <u>Id.</u> at 2.  Exhibit D includes Allied's application for group insurance, <u>id.</u> at 40, while the Policy does not.  Exhibit D contains Amendments 1 through 5, Ex. D. at 41-52, while the Policy produced during the claims process does not.  Otherwise, the two documents appear to be identical.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

4.   <u>Evidence Submitted by Plaintiff</u>

Plaintiff submits a declaration of Steven Moon ("Moon"), who identifies himself as the work capacity evaluator who performed a Functional Capacity Evaluation ("FCE") of Plaintiff on February 25, 2009.  Moon Decl. ¶¶ 1-2.[6]  Moon's FCE report is included in the Claim File.  CF 0583-0592.  In his declaration, Moon responds to the surveillance footage taken in September and October 2009. Plaintiff also submits his own declaration in which he responds to this footage.  ECF No. 42.[7]

Plaintiff also asks the Court to take judicial notice of the Bristol Hospital 2008 Annual Report and a motion filed in an unrelated action against Liberty in District Court for the Southern District of Ohio.  ECF No. 69.  The Court finds that these documents lack the indicia of reliability required under <u>Tremain</u>, 196 F.3d at 978, and it declines Plaintiff's request.

In finding the facts below, the Court relies on the evidence above and the facts decided and actually litigated in the prior denial-of-benefits action between the parties, <u>Prado v. Allied Domecq Spirits and Wine Gr. Disability Income Policy</u>, No. 05-2716, 2008 WL 191985 (N.D. Cal. Jan. 22, 2008) ("<u>Prado I</u>").

**B.   <u>The Parties</u>**

Plaintiff is a California resident; from February 1987 to September 2003, he worked as a production manager for Mumm Napa Valley ("Mumm"), a subsidiary of Allied Domecq Spirits and Wine.

---

[6] ECF No. 41.

[7] Liberty objects to the declarations of Moon and Plaintiff.  ECF No. 52.  The Court OVERRULES Liberty's objection, finding the declarations relevant under <u>Saffron</u>, 522 F.3d at 872, as related to a new reason for denial offered by Liberty in its final administrative decision.

United States District Court
For the Northern District of California

1   <u>Prado I</u> at 1.  As a production manager, Plaintiff managed all

2   aspects of winery bottling and warehouse operations, including

3   overseeing bottling, quality control, warehousing, specialty

4   packaging, procurement, inventory, planning, and scheduling.  CF

5   4083.

6        Liberty insured Plaintiff's long-term disability plan through

7   a group disability policy.  <u>Prado I</u> at 1.  Liberty served as the

8   claims administrator.  <u>Id.</u>

9        **C.    <u>The Plan</u>**

10       Plaintiff was a beneficiary of his employer's sponsored long-

11  term disability plan.  <u>Id.</u>   Under the Plan described in the

12  Policy, Liberty must pay out a monthly benefit to participants who

13  meet the definitions of "disabled" or "partially disabled."  Policy

14  at 6.  The Policy provides two definitions of "disability" -- one

15  for the first twenty-four-month period, and a second for the time

16  following this period.  Policy at 4.  A participant is disabled

17  during the first twenty-four months if he "is unable to perform all

18  the material and substantial duties of <u>his occupation</u> on an Active

19  Employment basis because of an injury or sickness."  Policy at 4

20  (emphasis added).  After this period, a person is disabled if he

21  "is unable to perform, with reasonable continuity, all of the

22  material and substantial duties of <u>his own or any other occupation</u>

23  for which he is or becomes reasonably fitted by training,

24  education, experience, age and physical and mental capacity."  <u>Id.</u>

25  at 5 (emphasis added).  The parties and the Court refer to these as

26  the "own occupation" and "any occupation" periods.

27       The Policy gives Liberty the authority, "in its sole

28  discretion, to construe the terms of this policy and to determine

benefit eligibility hereunder." <u>Id.</u> at 25.  "Liberty's decisions

regarding construction of the terms of this policy and benefit

eligibility shall be conclusive and binding." <u>Id.</u>  The Policy

requires that "[p]roof of claim must be given to Liberty." <u>Id.</u> at

27.  This proof must cover the date the disability started, the

cause of the disability, and the degree of the disability. <u>Id.</u>

### D.  <u>Plaintiff's Injury</u>

Plaintiff first injured his back while employed with Mumm in

1989.  CF 1399, 2308.  While on the job, a three-to-four-hundred-

pound piece of machinery fell on him when a forklift chain became

loose.  CF 1399.  Although Plaintiff was injured, he continued to

work as a production manager for Mumm. <u>Id.</u>  After chiropractic

care, physical therapy, and conservative treatment failed to

improve his chronic pain, Plaintiff sought treatment of a

neurosurgeon, Dr. Jay Levy ("Dr. Levy"), who performed an L5-S1

discectomy in 1991. <u>Id.</u>

The discectomy failed to cure Plaintiff's pain; Plaintiff

developed "internal derangement of his left knee," which was

treated with steroid injections.  CF 1294.  Plaintiff complained of

headaches, dizziness, blurred vision, and blackouts.  CF 1400.

Plaintiff had arthroscopic surgery on his knee in August 1999.  CF

1345.  While the surgery helped, he still claimed to have knee

pain.  He also complained of neck pain radiating into the left

shoulder and down the arm to the ring and little fingers, with

numbness, weakness, and tingling in the left arm.  CF 1376.  His

mobility and ability to lift weight were restricted.  CF 1376,

1377.

United States District Court
For the Northern District of California

On September 1, 2003, Plaintiff informed Liberty that his back pain and headaches had escalated to the point that he could no longer continue working.  CF 0561.  In October 2003, Dr. Levy stated that a lumbar MRI scan showed L5-S1 disc collapse and a cervical MRI scan showed spondylosis.  CF 2309.  Dr. Margaret A. Schlatter ("Dr. Schlatter") evaluated Plaintiff on January 19, 2004.  CF 1469.  She reported that at the time, Plaintiff was experiencing "daily chronic headaches" at a "10 out of 10 severity."  Id.  Dr. Schlatter noted that Plaintiff had "fairly normal range of motion" in his neck and back and a typical gait.  CF 1470.

Plaintiff filed a disability benefits claim, which Liberty received on March 25, 2004.  CF 2309.  On June 2, 2004, Liberty denied Plaintiff's claim.  CF 0561.  Liberty provided the following reason for the denial:  "There is insufficient evidence to show that you were disabled from the date you stopped working throughout the Elimination Period.  There is insufficient evidence on file to support restrictions and limitations that preclude you from performing your occupation from September, 2003, to the present."  Id.  Plaintiff appealed the decision and, on August 4, 2004, after further review, Liberty upheld its initial denial.   Id.

During the pendency of the appeal, Plaintiff was referred to an orthopedic spine surgeon, Dr. James Zucherman ("Dr. Zucherman").  CF 1852.  Dr. Zucherman noted normal gait and hip flexion, but recorded that Plaintiff had reported pain that was intense and "made worse by sitting, rising from sitting, leaning forward, walking, lying on the back, lying on the stomach, driving, coughing or sneezing, and bending forward."  CF 1852-1854.  Dr. Zucherman

1  recommended surgery.  Id.  In January 2005, Dr. Zucherman performed

2  a prosthetic disk replacement at L5-S1.  CF 2309.  While this

3  procedure initially decreased Plaintiff's back pain and allowed for

4  normal movement, subsequent visits through the rest of 2005 and

5  2006 noted continued complaints of back pain and neck pain.  Id.

6      Plaintiff then requested that Liberty reconsider its denial in

7  light of the treatment by Dr. Zucherman and other evidence.  CF

8  0562.  On May 6, 2005, Liberty informed Plaintiff that it would not

9  reconsider the claim because Plaintiff had already exhausted his

10  administrative remedies under ERISA.  Id.  Plaintiff filed suit

11  against Liberty, seeking review of Liberty's denial of benefits.

12  See Prado I (discussed in Part II.E, infra).

13      Plaintiff continued treatment with Dr. Zucherman during the

14  pendency of Prado I, experiencing continued symptoms in the neck

15  and lower back.  CF 2309.  Plaintiff was treated for his "chronic

16  back pain" by Dr. Maria Sheila Tabilon ("Dr. Tabilon") on January

17  27, 2006.  CF 2632.  An MRI scan performed in February 2006 showed

18  mild bulging discs at C4-5, C5-6, and C6-7.  CF 1988.  In April

19  2006, Dr. Zucherman reported that MRI scan showed degenerative disk

20  changes in the cervical spine with no protrusions, no stenosis, and

21  no neuroforaminal stenosis.  Id.  Dr. Zucherman consistently stated

22  that Plaintiff was totally disabled and unable to work.  CF 2309.

23      Plaintiff responded to several Oswestry Low Back Disability

24  Questionnaires during his treatment, yielding scores ranging from

25  sixty percent to eighty-six percent.  E.g., CF 0739, 0737, 1783,

26  1773.

27      On January 10, 2006, Plaintiff was evaluated by Dr. Jon

28  Sigurdson ("Dr. Sigurdson").  CF 1989.  Dr. Sigurdson noted that

United States District Court
For the Northern District of California

1   while Plaintiff "did get benefit and improvement" from Dr.
2   Zucherman's surgery, "the neck symptoms and headaches became more
3   of a problem and are now bothering him more than the low back." CF
4   1991.  He concluded that the cause of Plaintiff's pain, including
5   his headaches, was his 1989 injury. CF 1993.  He concluded that he
6   had a disability precluding heavy work, and was "temporarily
7   totally disabled as far as the neck and arms is concerned." Id.
8   He opined that "consideration of vocational rehabilitation and
9   ability to return to gainful employment would be premature." CF
10  1994.

11      On May 15, 2007, the Social Security Administration ("SSA")
12  held a hearing to determine whether Plaintiff had become disabled
13  from any occupation since September 2, 2003. CF 0548.  Dr.
14  Zucherman provided a medical source statement, in which he marked
15  that Plaintiff "has not been capable of performing sustained
16  SEDENTARY work on a regular and continuing basis." CF 0034.  He
17  reported that Plaintiff must lie down for three hours a day, and
18  could sit a total of two hours a day, stand a total of one hour a
19  day and walk up to an hour a day. Id.  Lifting and carrying was
20  limited to under five pounds and not more than an hour a day. Id.
21  The presiding Administrative Law Judge ("ALJ") found that Plaintiff
22  had been disabled from any occupation since September 2, 2003. CF
23  0548.  The ALJ identified the following "severe impairments":
24  "degenerative disc disease of the cervical and lumbar spine; spinal
25  stenosis with radiculopathy of the cervical spine; [and] late
26  postoperative lumbar pain." Id.  The ALJ accepted as credible
27  Plaintiff's rating of his pain at seven on a one-to-ten scale. Id.
28  ///

**E.   Prado I**

On January 22, 2008, this Court issued summary judgment in favor of Plaintiff in his then-pending action against Liberty.  See Prado I.   The Court found that Liberty operated under a structural conflict of interest as an entity that both made benefits determinations and paid for them.  Id. at 4.  It noted several instances in which this conflict appeared to influence Liberty's denial decision.  Specifically, Liberty had failed to provide Plaintiff with guidance as to what information was necessary in order for Plaintiff to perfect his claim.  Id. at 5.  It had failed to conduct a "meaningful dialogue" with Plaintiff in deciding whether to grant or to deny benefits by failing to use reasonable diligence to contact Plaintiff's health provider.  Id. at 7.  The Court found this conflict "is even manifest in the briefs submitted to this Court," noting that Liberty had made statements in its briefs that contradicted or mischaracterized the administrative record.  Id. at 8-9.  Accordingly, the Court reviewed Liberty's denial with discounted deference.  Id. at 9.

The Court concluded that Liberty abused its discretion in denying Plaintiff's claim.  The Court wrote, "Liberty may not ignore Plaintiff's subjective pain complaints and instead rely solely on objective evidence if evidence of Plaintiff's pain is not available."  Id. at 20.  The Court awarded long-term disability benefits for the twenty-four month "own occupation" period, and it remanded the claim to Liberty to determine if Plaintiff qualified for benefits beyond the first twenty-four months based on the "any occupation" definition of disability.  Id. at 21.
///

**United States District Court**
For the Northern District of California

**F.    Remand**

Following remand, Liberty assigned Plaintiff's claim to Elizabeth Kiernan ("Kiernan"), a disability claims technical specialist for Liberty.  At that time, the Claim File consisted of the entire record before this Court in <u>Prado I</u>, as well as workers' compensation records and other medical records produced by Plaintiff during <u>Prado I</u>.  CF 0007, 3032-4089.

Kiernan sent Plaintiff's counsel a letter on July 9, 2008 requesting that Plaintiff complete several forms.  On September 15, 2008, Plaintiff's counsel returned the completed forms to Kiernan. CF 3028.  In his responses to an activities questionnaire, Plaintiff stated that he was able to sit, stand, or walk for periods of ten to fifteen minutes.  CF 3023.  He stated that he left the house daily and was able to drive his daughter to school each day, work in his garden, and wash his car.  <u>Id.</u>  He reported that he sometimes would help his wife with grocery shopping by carrying "the light things."  CR 3024.  However, Plaintiff stated that back pain, neck pain and headaches prevented him from performing any gainful employment.  CF 3025.

On September 15, 2008, Liberty requested additional medical information from Plaintiff's identified providers for the period from June 1, 2005 to present.  Liberty also sent a letter to Plaintiff's counsel notifying him of the request.  CF 3020-3022. On September 19, 2008, Plaintiff's counsel responded, and the records sought were added to the Claim File.  CF 2347-3011, 2316-2346.

Liberty did not request an examination of Plaintiff.  Rather, Liberty referred the claim file to Dr. C. David Bomar ("Dr. Bomar")

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

for a paper review of Plaintiff's claim.  Dr. Bomar filed his
review on October 28, 2008.  CF 2308-2313.  Dr. Bomar concluded
that the file did not support "inability to work full time as of
2/28/06 to the present."  Id.  Dr. Bomar found that Plaintiff would
be capable of full-time work so long as it was "restricted to light
work with no lifting over roughly 20 pounds occasionally and
avoidance of more than occasional bending, squatting, stooping or
kneeling."  Id.  Dr. Bomar noted that while Dr. Zucherman
consistently reported that Plaintiff was totally disabled and
unable to work, "there were a number of Independent Medical
Evaluations from several orthopedic surgeons and neurosurgeons from
the late 1990s up to 2006, most of which gave the claimant a light
work capacity with avoidance of heavy lifting."  CF 2309.  Dr.
Bomar concluded that while "[s]ome degree of chronic low back pain
would not be unexpected," "inability to sit, stand or walk
frequently would not be expected."  CF 2310.

On October 29, 2008, Liberty sent Dr. Zucherman a letter
asking for additional information, requesting a response by
November 15, 2008.  CF 2306-2307.

Liberty then referred the claim for a transferrable skills
analysis.  CF 2233.  Liberty's vocational case manager, Michael
Patrick Cooper ("Cooper"), reviewed the claim file and conducted a
labor market survey.  CF 2233-2235.  Based on Plaintiff's
background and experience and the physical restrictions and
limitations described by Dr. Bonar, Cooper determined that
Plaintiff was capable of full-time sedentary work and light work
capacity, identifying five suitable occupations: winery production
supervisor, wholesale wine sales representative, telephonic

14

customer service representative, office assistant-production plant,
and small parts assembly.  Id.  Cooper also stated that these
occupations existed within Plaintiff's local and regional economy.
Id.

Liberty then referred the claim file for an "independent peer
review" with Dr. Richard Kaplan ("Dr. Kaplan").  CF 2215-2230.  Dr.
Kaplan did not examine Plaintiff personally.  CF 2227.  In his
December 17, 2008 report, Dr. Kaplan claimed that he had tried on
three occasions to contact Dr. Zucherman, but that Dr. Zucherman
did not respond.  CF 2223.  These calls were allegedly made on
December 18, 2008 at 3:07 a.m. EST, December 19, 2008 at 12:20 p.m.
EST, and December 22, 2008 at 9:46 a.m. EST.  CF 2223.[8]  Dr. Kaplan
concluded that after reviewing Plaintiff's medical history: "I
cannot identify any restrictions and limitations as of 2/2/06."  CF
2225.  Dr. Kaplan stated: "any restrictions which are reported in
terms of cervical and lumbar range are essentially based on
subjective symptoms of pain with no objective anatomical basis for
those findings."  Id.  Dr. Kaplan stated: "as of the present time
the claimant's presentation is essentially that of subjective pain
with subjective limitations in spinal range of motion without any
anatomical lesion or physiological reason to explain these reported
symptoms."  Id.  Dr. Kaplan concluded that Plaintiff was able to
perform at the light physical demand level, writing: "a return to
some form of gainful employment . . . would not only be possible

[8] Plaintiff notes that Dr. Kaplan dated and signed his report on
December 17, 2008, which is before the dates on which Dr. Kaplan
claims these calls were made and not returned.  Plaintiff argues
this is evidence that Dr. Kaplan had "no serious interest in Dr.
Zucherman's opinion," and suggests this "may explain why the
purported phone calls are made at odd times, such as the one
claimed to be made at 3:47 a.m."  Pl.'s Mot. at 16-17.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   but would also be highly recommended from a therapeutic
2   perspective." CF 2227.

3        Kiernan sent Dr. Zucherman a letter on January 13, 2009
4   requesting his response to Dr. Kaplan's report. Liberty made
5   several extensions of the deadline for Dr. Zucherman to respond,
6   ultimately extending it to February 28, 2009. CF 2198. Dr.
7   Zucherman did not respond by this deadline.

8        On March 2, 2009, Kiernan sent Plaintiff's counsel a letter
9   denying Plaintiff's claim for long term disability benefits,
10  finding that Plaintiff did not meet the definition of "disabled"
11  for the "any occupation" period. CF 2194-2917. The denial letter
12  did not identify Dr. Kaplan, Dr. Bonar, or Cooper by name, but it
13  did state that a board-certified orthopedic surgeon had reviewed
14  Plaintiff's claim and concluded that it did "not support inability
15  to work full time as of 2/28/06 to the present." CF 2195. The
16  denial letter noted Dr. Zucherman's failure to respond to Dr.
17  Kaplan's review. The denial letter noted that a vocational case
18  manager "has identified occupations in Mr. Prado's local and
19  regional area which are at the light level." CF 2196.

20       The denial letter informed Plaintiff of the procedure for
21  requesting a review of the denial. It stated that Plaintiff's
22  appeal should include "an opinion by Dr. Zucherman of the peer
23  review, any office notes, diagnostic test results, hospital
24  records, or any additional information which you feel will support
25  Mr. Prado's claim." CF 2196.

26       On April 12, 2009, Plaintiff's counsel wrote Kiernan,
27  requesting the Claim File, "all ERISA plan documents," and a number
28  of other documents. CF 2189-2192. The list of documents sought

**United States District Court**
For the Northern District of California

1   was extensive, and included twenty-six enumerated requests.

2   Plaintiff sought information on the orthopedic surgeon who reviewed

3   Plaintiff's claim, including "the number of reports prepared by

4   this physician for Liberty Life in each of the past three years,

5   and the number of those reports which were favorable to the

6   granting of or extension of disability benefits, and the number of

7   those reports which were favorable to the ending or termination of

8   disability benefits."  CF 2189.  Plaintiff also sought, <u>inter alia</u>,

9   "a list of things which you would accept to prove 'objective'

10  evidence of impairment due to pain"; "the policies and procedures

11  used by Liberty Life to assess 'self-reported' conditions, 'chronic

12  pain,' 'failed back syndrome,' and residual pain following back

13  surgery"; "all writings and records, whether or not in the claims

14  file, for each 'roundtable' or group conference which discussed the

15  claim of Antonio Prado"; "[a]ll plans or programs offered to

16  Liberty Life claims personnel which require, encourage or permit

17  those claims personnel to purchase or acquire Liberty Mutual

18  stock"; and "[a]ll policies and procedures of Liberty Life which

19  are designed to mitigate the structural conflict of interest of

20  Liberty Life in deciding which ERISA plan beneficiaries are

21  eligible for benefits and the financial interest of Liberty Life as

22  payor of those benefits."  CF 2189-2192.

23      On April 30, 2009, Kiernan sent Plaintiff's counsel a copy of

24  the Claim File and the Policy, which she alleged was "all the

25  information that was received, reviewed, and considered in our

26  evaluation of Mr. Prado's claim."  CF 2179.  Kiernan claimed that

27  Allied, not Liberty, was the plan administrator, and so Liberty was

28  not under an obligation under ERISA to produce plan documents.  <u>Id.</u>

1  Kiernan included the curriculum vitae of Dr. Bomar and Dr. Kaplan.

2  Id.  Kiernan rejected Plaintiff's requests for additional documents

3  and information, writing: "We do not agree with your interpretation

4  of the scope of Liberty's disclosure requirements and we are unable

5  to respond to your extensive requests for information."  Id.

6       On July 22, 2009, Plaintiff submitted his appeal; Liberty

7  received it on July 27, 2009.  CF 0602, 0546-0547.  Plaintiff

8  included with his appeal more than fifteen hundred pages of

9  documents.  CF 0548-2176.  The documents included a May 4, 2009

10  letter from Dr. Zucherman; Dr. Zucherman's medical records; medical

11  records from Kaiser Napa; a Functional Capacity Evaluation;

12  workers' compensation records; and the decision in Prado I.

13  Plaintiff also included the ALJ's decision in the SSA proceeding.

14  CF 0548-0555.  Plaintiff restated his request for additional

15  information, claiming that he was entitled under 29 C.F.R. §

16  2560.503(m)(8)(3) and (b)(5) to documents which "demonstrate[]

17  compliance" with "administrative processes and safeguards designed

18  to ensure and to verify that claim determinations are made in

19  accordance with governing plan documents and that, where

20  appropriate, the plan provisions have been applied consistently

21  with respect to similarly situated claimants."  CF 0546.

22  Plaintiff's counsel included a list of ten questions regarding

23  Liberty's claims procedure, such as:

24           In the event of a dispute between the opinion
             of a treating physician and a consultant hired
25           by Liberty, do you always accept the view of
             the Liberty consultant?
26
27           . . . .

28           What would you consider to be sufficient
             "objective" proof of impairment under the
             circumstances of this claim?  What is the

18

United States District Court
For the Northern District of California

1    medical basis of your standard?  Can you
     provide some examples of what you would accept,
2    or what you have accepted in the past, as
     sufficient "objective" proof of impairment for
3    individuals who have the same medical diagnoses
     as Mr. Prado?

4

5    . . . .

6    If you do not have written material which
     provides guidance on these questions, then how
     does Liberty ensure that similarly situated
7    claimants are treated alike?

8    CF 0546-0547.

9        Dr. Zucherman's May 4, 2009 response to Dr. Kaplan's review

10   stated that Plaintiff's "functional capacity is described in the

11   office notes of December 16, 2008, which indicate he can only sit

12   for a few minutes, walk about 1/4 of a mile, and do only very light

13   lifting." CF 0582.  Dr. Zucherman noted that limitations "are

14   based on subjective complaints," but stated, "just because Mr.

15   Prado does not have focal neurologic findings, as Dr. Kaplan

16   reports, it does not mean that he is functionally capable."  Id.

17   Dr. Zucherman wrote that while he was not a qualified medical

18   examiner, Plaintiff in December 2008 had Oswestry function score of

19   68, and "[i]n my experience, patients with a score this high are

20   not even able to do light work at full time.  Part-light work duty

21   with a control over his workstation would be a reasonable

22   expectation, in my mind."  Id.

23       The Functional Capacity Evaluation ("FCE") was performed by

24   Stephen Moon of Bay Area FCE, LLC on February 25, 2009.  CF 0583.

25   It consisted of an eight-hour test "to address this client's

26   current work capacity" and "identify any limitations or

27   accommodations needed."  Id.  Moon reported that Plaintiff

28   completed only three of the eight hours of scheduled testing "due

to pain and headache complaints." Id.  Plaintiff reached the sub-part time ability at the sedentary level.  Id.  Moon concluded that "no comments on his ability to work full time can be made at this time."  Moon also concluded that Plaintiff had "given variable to high amounts of physical effort during testing." Id.  Moon stated that Plaintiff's subjective complaints of pain "appeared to correlate with his observed behaviors during the testing that was able to be completed."  Id.  Moon stated: "There were no obvious inconsistencies with Mr. Prado's perceived abilities and his observed tolerances and clinical performance during the testing day."  Id.  The test included an Oswestry Low Back Disability Questionnaire on which Plaintiff received a score of 74; Moon stated that this score "represents the equivalent perception of being crippled."  CF 0587.  Moon concluded that Plaintiff's subjective reports of pain were "mostly reliable," based on "the overall trend and outcomes of the pain questionnaires, subjective ability log, repetitive motion testing, spinal and hand function sorts, and the general correlation between his subjective complaints and perceptions with his observed signs of discomfort." CR 0592.

Kiernan acknowledged receipt of Plaintiff's appeal and supporting documents in a July 28, 2009 letter.  CF 0594.  She refused Plaintiff's requests for additional documentation, referring to her April 30, 2009 letter.  Id.  The claim was forwarded to Liberty's appeal review unit in Dover, New Hampshire, and assigned to Liberty's appeal review consultant, Lisa Gray ("Gray").  CF 0003.

**United States District Court**
For the Northern District of California

1   On August 21, 2009, Plaintiff submitted to Liberty sixty pages
2   of additional medical literature, which Liberty added to the Claim
3   File.  CF 0463-0538.

4       On August 26, 2009, Gray sent Plaintiff's counsel a letter
5   stating that additional time was needed to render a determination
6   on Plaintiff's appeal.  CF 0461-0462.  The letter stated, "we are
7   currently waiting for additional information from your office,
8   which is necessary to render full and fair determination" of
9   Plaintiff's appeal.  Id.  The letter did not identify the
10  information needed.

11      Also on August 26, 2009, Gray contracted with Horsemen
12  Investigation ("Horsemen") to perform a surveillance investigation
13  of Plaintiff's activities around his Napa, California home.  CF
14  0542.  In the investigation referral form, Gray wrote, "No
15  neurological findings however claimant reports being able (sic) to
16  work due to severe back and neck pain and headaches."  Id.
17  "Claimant maintains he is only able to sit/stand for 30 minutes and
18  walk 20 minutes.  States he can sit and drive a car for 30 minutes.
19  He maintains he does not pursue any hobbies nor do volunteer work
20  and does not participate in an exercise program."  Horsemen
21  performed the surveillance of Plaintiff's residence on September 4,
22  5, 6, 7, and 10, 2009.  CR 0391-0405.

23      On September 6, 2009, Plaintiff's counsel responded to Gray's
24  August 26, 2009 request for additional information, stating, "I am
25  not aware of any information that has been requested from us, which
26  we have not provided.  The only information which Liberty requested
27  was a report from Dr. Zucherman, which was included with our
28  submission on July 22."  CF 0423.  For the third time, Plaintiff's

**United States District Court**
For the Northern District of California

counsel renewed his request for "policies and procedures with regard to how you assess claims where the work impairment is due to pain and therefore subjective in nature." Id. He wrote: "If you are aware of any tests or measurements which could be done and which would measure the extent of work impairment, please let us know.  From our view, there is nothing which is better than the Functional Capacity Evaluation which we forwarded to you on July 22." Id.

Plaintiff's counsel also renewed his request for information concerning Dr. Kaplan.  Plaintiff's counsel wrote that while Dr. Kaplan was well-published, "we note that his publications do not indicate any interest at all in the type of medical condition from which Mr. Prado suffers."  Plaintiff's counsel also noted that "Dr. Kaplan has a relationship to a business called Disability and Occupational Consultants . . . through which he acts as a disability evaluator.  However, every report of his which we have been able to locate, and every reference to him in published judicial opinions, refers to him as a defense evaluator -- in other words, he seems to have a demonstrated pro-defense bias." Id. Plaintiff's counsel noted that Dr. Kaplan had rendered an opinion for an insurance carrier in a case involving another one of his clients, writing:  "The odds that a doctor with a reasonably sized forensic practice located back east would be found on multiple files of my solo practice in California must be quite small . . . . Dr. Kaplan must be a very high volume source of defense medical reports." Id. Plaintiff's counsel concluded that given these concerns, "we think it fair to ask for the opportunity to comment upon any bias of the consultant who is being used on the appeal,

1  and we request that you provide the identity of that consultant so
2  that we have an opportunity to comment upon his or her
3  credentials."  Id.

4      On September 14, 2009, Horsemen reported to Gray on the
5  results of the surveillance.  CF 0391-0424.  Horsemen claimed that
6  it recorded video of Plaintiff raising the hood of a bronze Chevy
7  truck, "checking his mail," "pulling weeds," "placing five (5)-
8  gallon buckets into the bed of a truck," "moving three (3) trash
9  cans on wheels," "checking fluids in his pickup," as well as other
10  activities.  CF 0391-0405.  Horsemen acquired roughly twenty
11  minutes of video footage of some of these activities, which was
12  added to the Claim File.  Horsemen observed no activity on the part
13  of Plaintiff during surveillance on September 6, 2009.  CF 0399.
14  Horsemen's report stated that on each day Plaintiff was identified,
15  "Mr. Prado showed no visible signs of hesitation or restriction,
16  and did not utilize any discernible means of artificial support."
17  CF 0391, 0395, 0400, 0403.

18      On September 21, 2009, Plaintiff commenced this action,
19  claiming that Liberty had failed to make a timely ruling on the
20  pending appeal under 29 C.F.R. § 2560.503-1.  Compl. ¶ 6.  Liberty
21  received notice of the suit on September 29, 2009, but proceeded to
22  complete its review of the appeal.  CF 0002.

23      On September 23, 2009, Gray again wrote Plaintiff's counsel
24  stating that Liberty would need additional time to complete review
25  of Plaintiff's appeal.  CF 0406-0407.  Gray claimed this extension
26  was necessary because the volume of records received on appeal was
27  so large and because Liberty wanted additional information to
28  clarify Plaintiff's functional capacity and abilities.  Id.  Gray

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  stated that Liberty had requested a physician who was board

2  certified in physical medicine and rehabilitation to review the

3  claim file, and had asked this physician to contact Dr. Zuckerman

4  to discuss Plaintiff's status.  Id.  Gray asked Plaintiff's counsel

5  to "inform Dr. Zucherman and his office staff that he will be

6  receiving a call from this reviewing physician in the next two

7  weeks."  Id.  Gray refused Plaintiff's counsel's renewed request

8  for additional documentation, and did not identify the reviewing

9  physician by name.  Id.  On October 1, 2009, Gray submitted

10  Plaintiff's claim to the consulting physician for complete review.

11  CF 0002.

12      On October 5, 2009, Horsemen performed another surveillance of

13  Plaintiff's residence.  CF 0374.  While no video was recorded of

14  Plaintiff, Horsemen claimed that Plaintiff rolled two trash cans

15  from the curbside to the back of his residence, drove to Napa

16  Valley Community College, and walked onto the campus and back to

17  his car after utilizing a computer room.  CF 0374-0377. [9]

18  _____

19  [9] Plaintiff argues that the Court should disregard all of the
   surveillance evidence, alleging it was added to the administrative

20  record after the appeals process.  Under 29 C.F.R. § 2560.503-
   1(i)(1) and (i)(3)(i), an administrator has forty-five days to

21  decide a disability appeal, but may extend this time for an
   additional forty-five days if the plan administrator determines

22  that an extension is required, provides written notice of the
   extension, and indicates the special circumstances requiring an

23  extension of time and the date by which the plan expects to render
   the determination on review.  Liberty's August 26, 2009 letter --

24  sent less than forty-five days after its July 29, 2009 receipt of
   Plaintiff's appeal -- sought to extend Liberty's time to respond an

25  additional forty-five days to October 26, 2009, but did not
   indicate the special circumstances necessitating the extension.

26  Liberty's September 23, 2009 letter sought to extend Liberty's time
   to respond and indicated the special circumstances necessitating

27  the extension, but was not filed within forty-five days of the
   filing of the appeal.  As such, both of Liberty's attempts to

28  extend review were procedurally defective.  The Court finds these
   procedural defects are not proper grounds to strike evidence from
   the Claim File, however.  Nor does the Court accept Plaintiff's

United States District Court
For the Northern District of California

Dr. Gale Brown, Jr. ("Dr. Brown"), board certified in physical medicine and rehabilitation, prepared a report dated October 8, 2009.  CF 0359-0371.  Dr. Brown's report provided a list of "documentation reviewed," which included all the aforementioned documents, including the SSA Disability report and the video surveillance.  CF 0359.  Dr. Brown stated that her review addressed Plaintiff's "physical impairments and ability to perform any occupation full time, effective 2/29/06,"[10] but "does not address possible impairment related to chronic headaches and hypertension, as these fall beyond my current areas of expertise."  CF 0360.  Dr. Brown concluded that while partial physical impairment was supported by the documentation, Plaintiff "should have been able to resume full-time sedentary work by 2/29/06."  CF 0360.  Dr. Brown concluded that "[i]nconsistencies noted in Mr. Prado's statements, video surveillance data, and FCE performance raise questions regarding historical credibility and motivation."  Id.  Dr. Brown concluded that "[t]he FCE findings are considered unreliable in assessing Mr. Prado's functional capacity," and that Plaintiff's "reported severity of disability, as noted on Oswestry testing, is inconsistent with his demonstrated capacity on video surveillance." Id.  Dr. Brown identified restrictions and limitations that would apply to Plaintiff as of February 29, 2006: "Occasional lift/carry/push/pull 10 pounds; No overhead work or repetitive reaching over shoulder level; Occasional stand/walk, 30 minutes per

---

argument that it should disregard the surveillance video because Liberty allegedly misrepresented its reason for requesting additional time.

[10] The Court takes judicial notice of the fact that February 29, 2006 is not a valid date, as 2006 was not a leap year.

session; Brief position change (<1 minute) during periods of prolonged sitting, if needed." CF 0361.

Dr. Brown claimed to have made multiple attempts to contact Dr. Zucherman to obtain his opinion "as to whether Mr. Prado could have resumed full-time sedentary work by 2/29/06," with the first attempt made on September 30, 2009. CF 0370. On October 8, 2009, Brown faxed to Dr. Zucherman a letter asking that he respond to a series of questions. CF 0383-0384.[11] On October 20, 2009, Gray faxed Dr. Brown's letter to Dr. Zucherman a second time, asking him to respond by October 30, 2009. CF 0357-0358. Gray also wrote Plaintiff's counsel to advise that she needed more time to complete the appeal because she was still waiting for a response from Dr. Zucherman, and that if Dr. Zucherman did not respond by October 30, 2009, Liberty would render a determination without it. CF 0356-0358. The next day, on October 21, 2009, Gray faxed Dr. Zucherman again, stating that "under ERISA we have a requirement to render our decision within 90 days and it has come to my attention that the deadline will be October 25, 2009; therefore should you wish to provide your opinion to the following questions, please do so by October 25, 2009." CF 0353. Gray sent a copy of the letter to Plaintiff's counsel.

Plaintiff's counsel responded to Gray in a letter sent by fax on October 25, 2009. CF 0028. Plaintiff's counsel disagreed as to the due date to complete the review, but stated, "we cannot obtain a response from Dr. Zucherman in the small amount of time allowed." Id. Plaintiff's counsel stated that a number of the questions

---

[11] Plaintiff argues that the fact that this letter was sent on the same day Dr. Brown turned in her final report suggests Dr. Brown was not truly interested in incorporating Dr. Zucherman's responses into her report. Pl.'s Mot. at 20.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Liberty sought answered were included in prior statements by Dr.

2   Zucherman -- specifically, his January 10, 2006 and April 15, 2006

3   letters, and a February 27, 2007 SSA medical source statement.  CR

4   0029.

5        Plaintiff's counsel also expressed concerns about the

6   objectiveness of Dr. Brown, enclosing a deposition from another

7   case which he claimed "shows this physician is essentially employed

8   full time working for Liberty Mutual."  CF 0046-0101.  In this

9   deposition, conducted October 25, 2009, Dr. Brown states that she

10  has not engaged in direct patient care since December 31, 2002;

11  that she has worked for Liberty since 2000; that she has worked

12  approximately thirty hours per week for Liberty during several of

13  those years; and that she reviewed more than one hundred claims for

14  Liberty in 2005.  CF 0049, 0054.  Plaintiff's counsel sought the

15  twenty-five most recent reports done for Liberty by Dr. Brown, with

16  the names of the claimants removed.  CR 0029.  Plaintiff's counsel

17  also included additional medical writing on evaluation of pain.

18  Id.

19       On October 27, 2009, Liberty upheld its denial of Plaintiff's

20  claim, confirming its earlier determination that Plaintiff was not

21  disabled from performing "any occupation."  CF 0017-0025.  In the

22  letter, Gray referenced the findings of Dr. Kaplan and Dr. Brown;

23  Dr. Zucherman's failure to respond to Dr. Brown's questions; the

24  surveillance reports; the Oswestry disability scoring; and the FCE.

25  Id.  The SSA decision was not mentioned, although Gray did state

26  that Liberty had received the correspondence sent by Plaintiff's

27  counsel and considered this information.  CF 0018.  Gray stated

28  that the record demonstrated "[m]ultiple functional inconsistencies

**United States District Court**
For the Northern District of California

1   and inconsistent pain behaviors . . . raising questions regarding

2   historical credibility and motivation."  CF 0020.

3

4   **III.  CONCLUSIONS OF LAW**

5       **A. Legal Standards**

6           1.   Rule 52(a)

7       Federal Rule of Civil Procedure 52(a)(1) provides: "In an

8   action tried on the facts without a jury . . ., the court must find

9   the facts specially and state its conclusions of law separately."

10  In a Rule 52 motion, as opposed to a Rule 56 motion for summary

11  judgment, the court does not determine whether there is an issue of

12  material fact, but actually decides whether the plaintiff is

13  disabled under the policy.  See Kearney v. Standard

14  Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999).  The court is to

15  "evaluate the persuasiveness of conflicting testimony," and make

16  findings of fact.  Id.

17          2.   ERISA Standard of Review

18      ERISA benefits determinations are to be reviewed de novo

19  unless the language of the plan documents gives the administrator

20  discretionary authority to determine eligibility for benefits or to

21  construe the terms of the plan.  Met. Life Ins. Co. v. Glenn, 554

22  U.S. 105, 111-12 (2008).  Where an administrator has retained

23  discretionary authority, abuse of discretion is the appropriate

24  standard of review.  Id.  A plan administrator that also acts as

25  the funding source for benefits operates under a "structural"

26  conflict of interest.  Abatie v. Alta Health & Life Ins. Co., 458

27  F.3d 955, 965 (9th Cir. 2006).  Such a conflict "must be weighed as

28  a factor in determining whether there is an abuse of discretion."

United States District Court
For the Northern District of California

1   Glenn, 554 U.S. at 111-12.  This is because "[a]n insurance company

2   that approaches claims-handling unfairly in an ERISA plan may have

3   an incentive to be more unfair than, say, a life insurer or auto-

4   liability insurer, because it cannot be subjected to the punitive

5   damages for bad faith that are the bogeymen of insurance companies

6   in those fields."  Salomaa v. Honda Long Term Disability Plan, No.

7   --- F.3d ---, 2011 WL 2040934, at *7 (9th Cir. May 26, 2011).  This

8   leads to an abuse-of-discretion standard "tempered by skepticism

9   commensurate with the plan administrator's conflict of interest."

10  Abatie, 458 F.3d at 959.

11          **B.**   **Liberty's Conflict of Interest**

12          This Court has already found that Liberty operates under a

13  structural conflict of interest and ruled that the applicable

14  standard of review is "abuse of discretion tempered with skepticism

15  commensurate with Liberty's conflict of interest."  Aug. 2, 2010

16  Order at 14.  The Court must determine whether this conflict of

17  interest affected Liberty's decision to deny Plaintiff's claim, and

18  if it did, how much weight the Court should give it.  Having

19  considered all of the evidence, the Court concludes that this

20  conflict had a considerable effect on the decisions Liberty made in

21  denying Plaintiff's claim.

22          First, the Court notes Liberty's marked hostility to any

23  evidence relating to Liberty's conflict of interest being shared

24  with Plaintiff during the claims process or put before the Court.

25  ERISA regulations provide that "the claims procedures of a plan

26  will not be deemed to provide a claimant with a reasonable

27  opportunity for a full and fair review" unless they provide the

28  claimant access to "all documents, records, and other information

29

relevant to the claimant's claim for benefits."  29 C.F.R. §

2560.503-1(h)(2)(iii).  A document is "relevant" to a claim if it:

> (i) Was relied upon in making the benefit determination;
>
> (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
>
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination;[12] or
>
> (iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

29 C.F.R. § 2560.503-1(m)(8).

Plaintiff and his counsel made multiple attempts during the claims process to acquire information relevant to determining the effect of the conflict of interest, such as information on the approval/denial rates of the reviewing doctors and "[a]ll policies and procedures of Liberty Life which are designed to mitigate the structural conflict of interest of Liberty."  CF 2189-2192. Liberty summarily rejected these requests, claiming that it had submitted all the information "received, reviewed, and considered" in evaluating Plaintiff's claim, and that it was under no obligation under ERISA to produce additional information.  CF 2179.

---

[12] Paragraph (b)(5) requires that "claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."  29 C.F.R. § 2560.503-1(b)(5).

United States District Court
For the Northern District of California

1     There are two possible conclusions the Court can make from the

2  above.  The first is that Liberty lacked administrative processes

3  and safeguards to ensure claim determinations were made in

4  accordance with plan documents and that similarly situated

5  claimants were treated similarly, and that no statements of policy

6  or guidance existed to guide Liberty's representatives in

7  evaluating Plaintiff's claim.  The second is that Liberty had such

8  processes, safeguards, and policies, but refused to share them with

9  Plaintiff during the claims process.  Either situation would

10  violate ERISA regulations.

11     Liberty's refusal to disclose relevant documents continued

12  into this action.  The Court granted Plaintiff leave to conduct

13  limited discovery into the nature, extent, and effect of Liberty's

14  conflict of interest on its decision-making process.  Aug. 2, 2010

15  Order.  Plaintiff served on Liberty a request for such documents

16  under Federal Rule of Civil Procedure 34, but Liberty objected to

17  the requests as vague and ambiguous and "exceed[ing] the scope of

18  permissible discovery in ERISA."  Padway Decl. Ex. 2 ("Def.'s

19  Resp.") at 24.[13]  Rather than produce evidence, Liberty stated, in

20  a response not attributed to a specific declarant, that it had

21  "employed a number of measures to insure that its claim

22  determinations are not influenced by financial considerations,"

23  including locating disability case managers in different offices,

24  cities and states than employees who make underwriting and premium

25  decisions.  Id. at 25.  Liberty continued: "at no time has the

26  compensation the claims personnel involved in the handling of

27

28  [13] Laurence F. Padway ("Padway"), counsel for Plaintiff, filed a
     declaration in support of Plaintiff's Motion.  ECF No. 43.

Plaintiff's claim or the appeal of claim determinations been based on or determined according to the number of claims for disability benefits that have been denied or terminated, including plaintiff's."  Id.  This is an improper response to Plaintiff's Rule 34 request.  The sole evidence Liberty filed in support of its Motion is the declaration of McGee, a litigation manager of disability claims for Liberty, who declares that Liberty takes steps "to ensure that a claim decision is not influenced by the company's financial interests," such as geographically separating disability case managers and underwriters and not compensating claims personnel "according to the number of claims for disability benefits that have been denied or terminated" or number of appeal denials.  McGee Decl. ¶¶ 1-4.[14]

Failure to present extrinsic evidence of an effort to assure accurate and unbiased claims assessment, such as "statistics regarding [the administrator's] rate of claims denials or how frequently it contracts with the file reviewers it employ[s]," is a factor according significant weight to the conflict of interest. Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 634 (9th Cir. 2009).  The Court finds that there is very little evidence of an effort to limit the effect of Liberty's conflict of interest. The Court also finds that by refusing to respond to Plaintiff's requests for information, Plaintiff's right to a "full and fair review" under 29 C.F.R. § 2560.503-1 was compromised.

---

[14] Liberty offers its response to Plaintiff's Rule 34 request, as well as the McGee declaration, as evidence that Liberty took steps to minimize the effect of the conflict of interest.  Def.'s Opp'n at 4.  The Court finds Liberty's Rule 34 response to be improper, and it gives little weight to the statements of McGee, who admits that she works within Liberty's litigation department and is familiar with Plaintiff's claim.

**United States District Court**
For the Northern District of California

1   Another factor is the administrator's "decision to conduct a
2   'pure paper' review . . . that is, to hire doctors to review
3   [plaintiff's] files rather than to conduct an in-person medical
4   evaluation of him." <u>Montour</u>, 588 F.3d at 634.  Here, Drs. Bonar,
5   Kaplan, and Brown all completed pure paper reviews of Plaintiff's
6   file.  Liberty alleges that no physical examination was performed
7   because the operative question was whether Plaintiff was disabled
8   as of February 2006, and so an inquiry into his current physical
9   status would be of little value.  Following this logic, the 2009
10  surveillance video would be of little probative value of whether
11  Plaintiff was disabled in 2006, yet Liberty placed great weight on
12  the surveillance in its final benefits denial.  As such, there are
13  internal logical conflicts within Liberty's argument.
14      Another factor in determining what weight to afford a conflict
15  of interest is a plan administrator's failure to respond to a
16  contrary SSA disability determination.  <u>Montour</u>, 588 F.3d at 634.
17  "While ERISA plan administrators are not bound by the SSA's
18  determination, complete disregard for a contrary conclusion without
19  so much as an explanation raises questions about whether an adverse
20  benefits determination was the product of a principled and
21  deliberative reasoning process," and "may indicate a failure to
22  consider relevant evidence." <u>Id.</u>  Liberty claims that it
23  considered the SSA decision in which Plaintiff was found to suffer
24  from a long-term disability, but there is nothing in the Claim File
25  to support this contention.  Gray does not mention it by name in
26  the October 27, 2009 denial letter.  In her report, Dr. Brown
27  states she considered it, but it is not discussed.
28

33

United States District Court
For the Northern District of California

1    Another factor is Liberty's failure to provide Plaintiff with

2  guidance as to what sort of evidence Liberty would find acceptable

3  to establish a disability based on Plaintiff's pain.  A plan

4  administrator denying benefits in the first instance must "notify

5  the claimant not just of the opportunity for internal agency review

6  of that decision but also of what additional information would be

7  necessary to perfect the claim."  Montour, 588 F.3d at 636

8  (quotation marks omitted).  In its initial claim denial, Liberty

9  suggested Plaintiff include "an opinion by Dr. Zucherman of the

10  peer review, any office notes, diagnostic test results, hospital

11  records, or any additional information which you feel will support

12  Mr. Prado's claim."  CF 2196.  Plaintiff asked again and again for

13  clarification as to what evidence Liberty would consider to be

14  credible objective evidence of Plaintiff's pain, and was rebuffed

15  repeatedly.  Liberty's responses offered no guidance as to how

16  Plaintiff could perfect his claim.  Liberty's failures are all the

17  more troubling given that the Court found in Prado I that Liberty

18  had "provided no guidance to Plaintiff for what, specifically,

19  Liberty needed in order to make an informed decision on Plaintiff's

20  claim."  Prado I at 6.

21    Yet another factor is Liberty's reliance, at the eleventh

22  hour, on the surveillance footage.  "[A]n administrator that adds,

23  in its final decision, a new reason for denial, a maneuver that has

24  the effect of insulating the rationale from review, contravenes the

25  purpose of ERISA."  Abatie, 458 F.3d at 974.  "This procedural

26  violation must be weighed ... in deciding whether [the

27  administrator] abused its discretion."  Id.  While Liberty's

28  initial denial was premised on a lack of evidence of physical

United States District Court
For the Northern District of California

1   impairment, its final decision hinged on the Plaintiff's lack of

2   credibility in light of the surveillance footage.  Furthermore,

3   Liberty's last-minute reliance on the surveillance footage did not

4   give Plaintiff an opportunity to respond to this basis for denial.

5        The Court also notes several tactics Liberty used which

6   Plaintiff alleges had the effect of compromising the fairness of

7   the claims process.  Plaintiff points to Liberty's refusal to

8   promptly identify the names of its reviewing physicians; the

9   inconsistencies between the date of Dr. Kaplan's report and the

10  dates Dr. Kaplan alleges he attempted to contact Dr. Zucherman; the

11  fact that calls to Dr. Zucherman were made at odd hours; and the

12  fact that Liberty claimed an extension of the appeals period was

13  required due to outstanding requests for information when no such

14  outstanding requests existed.  See Pl.'s Mot.  While these may not

15  be actionable in themselves, they do create the impression that the

16  individuals handling and evaluating Plaintiff's claim on behalf of

17  Liberty were less interested in offering a neutral and fair

18  evaluation of Plaintiff's claim than they were in erecting

19  procedural roadblocks.

20       Finally, the Court considers the evidence in the Claim File

21  suggesting that Liberty's reviewing doctors operated under a

22  conflict of interest.  The evidence submitted by Plaintiff suggests

23  Dr. Brown has not treated patients since 2002, and consults for

24  several disability insurers.  CF 0048.  She has stated that she

25  regularly worked upwards of thirty hours per week evaluating claims

26  for Liberty.  CF 0049.  Similar evidence suggests Drs. Bomar and

27  Kaplan operated under a conflict of interest.  Liberty had the

28  opportunity to add to the Claim File evidence that the medical

1  examiners they contracted with where shielded from bias, but chose

2  not to do so.

3       The Court concludes that Liberty's conflict of interest had a

4  marked and pervasive effect on its claims determination process.

5  It tempers its abuse-of-discretion review accordingly.

6       **C.  Abuse of Discretion**

7       When there is a conflict of interest, "a modicum of evidence

8  in the record supporting the administrator's decision will not

9  alone suffice." Montour, 588 F.3d at 626.  A plan administrator

10  abuses its discretion if its decision is "(1) illogical, (2)

11  implausible, or (3) without support in inferences that may be drawn

12  from the facts in the record." Salomaa, 2011 WL 2040934, at *8.

13  In Salomaa, the Ninth Circuit reversed a plan administrator's

14  denial under this standard because (1) every doctor who examined

15  the plaintiff concluded that he was disabled; (2) the plan

16  administrator demanded objective tests to establish the existence

17  of a condition for which there are no objective tests; (3) the

18  administrator failed to consider an SSA disability award; (4) the

19  reasons for denial shifted as they were refuted, were largely

20  unsupported by the medical file, and only the denial stayed

21  constant; and (5) the plan administrator failed to engage in the

22  required "meaningful dialogue" with plaintiff.  Id.

23       The Court finds many similarities between the present case and

24  Salomaa.  Dr. Zucherman consistently concluded that Plaintiff was

25  totally disabled.  Dr. Sigurdson concluded he suffered from a

26  disability precluding heavy work and was "temporarily totally

27  disabled as far as the neck and arms is concerned."  CF 1993.  No

28  doctor who examined Plaintiff around February 28, 2006 determined

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  that Plaintiff was capable of returning to full-time work.  Liberty
2  had the opportunity and right under the Plan to examine Plaintiff,
3  but chose not to.

4       Second, while Liberty never demanded objective tests of
5  Plaintiff's pain, the reviewing doctors discounted Plaintiff's
6  self-reported pain as "subjective."  It is clear from Dr. Kaplan's
7  report that the lack of objective evidence of disability was a
8  major factor in his conclusion that Plaintiff was not disabled, and
9  it is clear that he gave little weight to Plaintiff's subjective
10 reports of pain.  CF 2225 (finding "no objective anatomical basis"
11 for restrictions, and concluding, "as of the present time the
12 claimant's presentation is essentially that of subjective pain with
13 subjective limitations in spinal range of motion without any
14 anatomical lesion or physiological reason to explain these reported
15 symptoms").  Liberty discounted the Oswestry scores and concluded
16 that the FCE testing was unreliable.  Thus, while Liberty did not
17 demand objective tests, it placed little weight on Plaintiff's
18 subjective reports, discredited every objective test conducted and
19 submitted by Plaintiff, and refused to identify an objective test
20 that Liberty deemed acceptable.

21      Third, Liberty clearly failed to consider the SSA disability
22 award.  It is not mentioned in the final denial letter, and is not
23 discussed in Dr. Brown's report.

24      Fourth, as stated above, Liberty's reasons for denial shifted
25 as they were refuted.  The final reasons for denial are also
26 unsupported by the record.  Liberty treats the surveillance footage
27 as a smoking gun, but a careful review of the record shows
28 otherwise.  As Plaintiff points out, much of the activity Horsemen

**United States District Court**
For the Northern District of California

1  claimed to have witnessed is not captured in the video footage.

2  The activity reported is not inconsistent with Plaintiff's self-

3  reported activity.  In the questionnaire submitted in July 2008,

4  Plaintiff stated he could sit, stand, or walk for periods of ten to

5  fifteen minutes; that he left his house daily; and that he could

6  drive his daughter to work, tend to his garden, wash his car, and

7  carry light groceries.  CF 3023-3024.  This level of activity is

8  what is demonstrated in the surveillance video.  Liberty submits

9  twenty minutes of surveillance footage -- culled from six days of

10 surveillance -- as evidence that Plaintiff could walk, stand, and

11 sit for periods of thirty minutes or longer.  The evidence simply

12 does not show this.  Furthermore, several doctors who performed in-

13 person evaluations of Plaintiff noted that his gait and range of

14 motion was normal.  <u>E.g.</u>, CF 1852-1854, 1470.  Thus, the fact that

15 Plaintiff did not display "visible signs of hesitation or

16 restriction" is not inconsistent with the record.

17     That Liberty also premises its final denial on Dr. Zucherman's

18 failure to respond to Dr. Brown's request for information is

19 perplexing.  Liberty did not explain to Plaintiff why Dr.

20 Zucherman's response was critical during the appeal, and it has

21 failed to do so in this action.  Most of the information sought was

22 already in the record.  Dr. Zucherman had made a determination that

23 as of February, 2006, Plaintiff was completely disabled.  On May 4,

24 2009, he clarified that he was "not a qualified medical examiner"

25 and that the limitations were "based on subjective complaints," but

26 otherwise confirmed this determination, finding "part-time light

27 duty work with control over his workstation" to be a "reasonable

28 expectation."  CF 0582.

**United States District Court**
For the Northern District of California

1    There are other inconsistencies between Liberty's final denial
2    and the record.  Dr. Brown clearly states that her report did not
3    address "possible impairment related to chronic headaches and
4    hypertension, as these fall beyond my current area of expertise."
5    CF 0360.  But it is clear from the record that Plaintiff's
6    headaches were a major cause of his disability.  Similarly, Dr.
7    Brown concludes that Plaintiff's activity would be restricted to
8    lifting, carrying, pushing, and pulling weights up to ten pounds,
9    that he could not perform overhead work, and that he would be
10   limited to "occasional walking or standing, for 30 minutes at a
11   time."  CF 0361.  These restrictions are inconsistent with the
12   restrictions Cooper considered when he identified five suitable
13   occupations for Plaintiff that existed within his local and
14   regional economy.  CF 2233-2235.  Cooper had assumed Plaintiff was
15   capable of lifting up to twenty pounds and would not otherwise be
16   restricted, save for "avoidance of more than occasional bending,
17   squatting, stooping or kneeling."  CF 2308-2313.

18   Finally, Liberty clearly failed to engage in meaningful
19   dialogue with Plaintiff by failing to provide guidance on how to
20   perfect his claim, refusing Plaintiff's repeated requests for
21   information, and denying Plaintiff the opportunity to respond to
22   Dr. Brown's analysis of the surveillance video.

23   On the basis of the above, the Court finds Liberty abused its
24   discretion in denying Plaintiff's claim.  Having considered the
25   evidence, the Court finds that Plaintiff is disabled under the "any
26   occupation" standard as of February 28, 2006, and is thus entitled
27   to long-term disability benefits under the Plan.
28   ///

United States District Court
For the Northern District of California

1   **D.   Plaintiff's Claim under California Insurance Code 10111.2**

2       Plaintiff has filed a separate claim against Liberty for

3   interest due under section 10111.2 of California's Insurance Code.

4   Pl.'s Mot at 25.   Section 10111.2 provides for prejudgment interest

5   at a rate of ten percent.   Cal. Ins. Code § 10111.2.   Liberty

6   argues that section 10111.2 is preempted by ERISA.   Many courts

7   have found that allowing a plaintiff to proceed with a state law

8   claim under section 10111.2 would effectively impose a mandatory

9   prejudgment interest rate of ten percent on successful ERISA

10  claims, improperly expanding the scope of ERISA damages and

11  supplementing the ERISA enforcement remedy.   E.g., White v.

12  Coblentz, Patch and Bass LLP Long Term Disability Ins. Plan, No.

13  10-1855, 2011 WL 2531193, at *6 (N.D. Cal. June 24, 2011);

14  Turnispeed v. Educ. Mgmt. LLC's Emp. Disability Plan, No. 09-3811,

15  2010 WL 140384, at *4 (N.D. Cal. Jan. 13, 2010); Minton v. Deloitte

16  & Touche USA LLP Plan, 631 F. Supp. 2d 1213, 1220 (N.D. Cal. 2009).

17  Accordingly, the Court finds Plaintiff's claim for interest under

18  section 10111.2 to be preempted by ERISA, and finds for Liberty on

19  this claim.

20  **E.   Plaintiff's Claim under 29 U.S.C. § 1332(c)**

21      Plaintiff argues that Liberty failed to provide documents

22  during the claims procedure, and thus Liberty must pay 29 U.S.C.

23  1332(c)'s daily statutory penalty for failing to provide documents.

24  Pl.'s Mot at 23.   ERISA provides that any "administrator" who

25  "fails to comply with a request for any information which such

26  administrator is required by this subchapter to furnish to a

27  participant or beneficiary (unless such failure or refusal results

28  from matters reasonably beyond the control of the administrator)"

United States District Court
For the Northern District of California

1    may be liable in the court's discretion for an amount up to $100

2    per day from the date of such failure or refusal."  29 U.S.C. §

3    1332(c).  Plaintiff claims that Liberty failed to produce the Plan

4    documents and "relevant" documents under 29 C.F.R. § 2560.503-

5    1(m)(8), and thus should be liable under section 1332(c).

6        Liberty argues that it served as the "claims administrator,"

7    and not the "plan administrator," and that section 1332(c) only

8    applies to plan administrators.  Liberty also argues that section

9    1332(c) does not extend to "relevant" documents under 29 C.F.R. §

10   2560.503-1(m)(8), and that it produced all Plan documents during

11   the claims process.

12       The Court has determined that by failing to produce "relevant"

13   documents during the claims process, Liberty denied Plaintiff a

14   "full and fair review" of his claim.  At issue is whether Liberty

15   should be subject to the $100-per-day penalty under section 1332(c)

16   for this failure.  By its terms, section 1332(c) is limited to

17   information required by "this subchapter."  29 U.S.C. § 1332(c).

18   As such, it does not extend to documents identified in 29 C.F.R. §

19   2560.503-1.  See Ramos v. Bank of America, --- F. Supp. 2d ---,

20   2011 WL 900365, at *2 (N. D. Cal. Mar. 15, 2011) ("While §

21   2560.503-1 does impose requirements on plans with regard to claim

22   procedures, nothing in the statutory or regulatory scheme suggests

23   that an ERISA claimant may bring an action for civil penalties

24   under § 1132(c) for a plan's failure to comply with those

25   requirements.").  The Court finds that Liberty satisfied its

26   disclosure duties under section 1132(c) by producing the Policy and

27   SPD, and finds for Liberty on this claim.

28   ///

**United States District Court**
For the Northern District of California

1    **F.    Attorneys' Fees**

2         Plaintiff additionally seeks attorneys' fees.  Pl.'s FFCL ¶

3    85.  29 U.S.C. § 1132(g) allows the Court to award attorneys' fees

4    and costs in civil actions under ERISA.  In Hummell v. S.E. Rykoff

5    & Co., the Ninth Circuit provided five factors that guide the

6    Court's exercise of discretion in this matter.  634 F.2d 446, 453

7    (9th Cir. 1980).  These factors include: (1) the degree of the

8    opposing parties' culpability or bad faith; (2) the ability of the

9    opposing parties to satisfy an award of fees; (3) whether an award

10   of fees against the opposing parties would deter others from acting

11   under similar circumstances; (4) whether the parties requesting

12   fees sought to benefit all participants and beneficiaries of an

13   ERISA plan or to resolve a significant legal question regarding

14   ERISA; and (5) the relative merits of the parties' positions.  Id.

15   A proper application of the factors generally results in an award

16   of fees and costs to plaintiffs who succeed on any significant

17   issue in litigation.  Smith v. CMTA-IAM Pension Trust, 746 F.2d

18   587, 589 (9th Cir. 1984).

19        The Court finds that several of these factors favor an award

20   of attorneys' fees to Plaintiff -- chiefly, Liberty's actions

21   during the claims process and the current action in failing to

22   produce documents and in mischaracterizing the administrative

23   record border on bad faith.  The Court finds that an award of

24   attorneys' fees may deter other claim administrators from engaging

25   in similar behavior.  Accordingly, the Court finds an award of

26   attorneys' fees to Plaintiff to be appropriate.

27   ///

28   ///

**United States District Court**
For the Northern District of California

1   IV.   <u>CONCLUSION</u>

2        For the forgoing reasons, the Court finds as follows:

3   •   The Court finds in favor of Plaintiff Antonio Prado and

4        against Defendant Allied Domecq Spirits and Wine Group

5        Disability Income Policy and Real Party in Interest Liberty

6        Life Assurance Company of Boston on Plaintiff's first claim

7        for relief for failure to extend benefits under a long-term

8        disability plan covered by ERISA.  Plaintiff is entitled to

9        back benefits from March 1, 2006 until the date thirty days

10       after the date of this Order.  The parties are to meet and

11       confer on the amount of back benefits and file a stipulation

12       on that amount within fourteen (14) days of the date of this

13       Order.  If the parties are unable to agree, they shall each

14       file within fourteen (14) days of the date of this Order a

15       letter brief not to exceed three pages setting forth their

16       position.  Commencing thirty (30) days after the date of this

17       Order, Liberty shall pay Plaintiff monthly benefits as they

18       come due for so long as he remains disabled and eligible for

19       benefits under the policy.

20   •   The Court finds in favor of Liberty and against Plaintiff on

21       Plaintiff's second claim for relief for interest under

22       California Insurance Code § 10111.2.

23   •   The Court finds in favor of Liberty and against Plaintiff on

24       Plaintiff's third claim for relief for failure to produce

25       records under 29 U.S.C. § 1332(c).

26   •   Plaintiff is entitled to attorneys' fees and costs under 29

27       U.S.C. § 1132(g).  Within thirty (30) days of this Order,

28       Plaintiff shall file a motion for attorneys' fees, supported

1   with appropriate evidence.  Liberty shall have fourteen (14)

2   days from to object to Plaintiff's motion or the evidence

3   submitted in support of it.  The Court will enter judgment in

4   this action after it rules on Plaintiff's motion.  If

5   Plaintiff fails to file a motion for attornseys' fees within

6   this timeframe, the Court will enter its final judgment in

7   this action and close the case.

8

9   IT IS SO ORDERED.

10

11  Dated: July 22, 2011



12                          UNITED STATES DISTRICT JUDGE

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>